# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*Young v. Illinois Human Rights Comm'n*, 2012 IL App (1st) 112204

| | |
|---|---|
| Appellate Court Caption | TAWANNA YOUNG, Petitioner-Appellant, v. ILLINOIS HUMAN RIGHTS COMMISSION, THE DEPARTMENT OF HUMAN RIGHTS, and THE CITY OF CHICAGO, Department of Streets and Sanitation, Respondents-Appellees. |
| District & No. | First District, Second Division<br>Docket No. 1-11-2204 |
| Filed<br>Rehearing denied | June 26, 2012<br>July 17, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The Illinois Human Rights Commission's dismissal of petitioner's charge of employment discrimination was upheld due to the lack of evidence that petitioner was denied overtime, was issued a written reprimand, and was ultimately discharged from her employment with respondent city due to her sexual orientation in violation of the Illinois Human Rights Act. |
| Decision Under Review | Petition for review of order of Illinois Human Rights Commission, No. 2009-CN-1399. |
| Judgment | Affirmed. |

Counsel on
Appeal

Tawanna Young, of Chicago, appellant *pro se*.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Mary C. Labrec, Assistant Attorney General, of counsel), for appellees.

Panel

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.

Justices Connors and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1    On October 24, 2008, respondent City of Chicago's department of streets and sanitation (the City) terminated petitioner Tawanna Young's (Young) employment. Young filed a discrimination charge against the City with the Illinois Department of Human Rights (the Department) under the Illinois Human Rights Act (the Act) (775 ILCS 5/1-101 *et seq.* (West 2006)), alleging that, due to her sexual orientation, the City: (1) denied her overtime work hours; (2) issued her a "written reprimand" and two-day suspension; and (3) discharged her. The Department dismissed Young's charge for lack of evidence. Young timely filed a request for review by the Illinois Human Rights Commission (the Commission). After the Commission vacated the dismissal and remanded the charge for further investigation by the Department, the Department dismissed Young's charge for the second time. Young subsequently filed a second request for review by the Commission. The Commission concluded that the Department properly dismissed Young's discrimination charge for lack of evidence.

¶ 2    On this direct appeal, Young seeks review of the July 5, 2011 order of the Illinois Human Rights Commission.

¶ 3    For the following reasons, we find that there was no substantial evidence to support a charge of discrimination and uphold the Commission's decision.

¶ 4                    BACKGROUND

¶ 5    On June 30, 2006, Young, a homosexual, was hired to work as a laborer for the City. During the first year-and-a-half of her employment, Young began to have difficulties with one of her supervisors, Assistant General Superintendent Eric McKennie (McKennie), who placed a number of disciplinary actions against her, including a two-day suspension.

¶ 6    On October 24, 2008, the City terminated Young's employment after she was absent from work for three weeks. During this three-week period, Young was in jail for what she claimed to be false charges unrelated to this case.

¶ 7    On November 10, 2008, Young filed a discrimination charge against the City with the

Department under the Act, alleging that she received less favorable treatment than similarly situated nonhomosexual employees. She claimed that, due to her sexual orientation, the City: (1) denied her overtime work hours; (2) issued her a "written reprimand" and two-day suspension; and (3) discharged her.

¶ 8 The statute provides the following procedure for a discrimination claim. A discrimination charge may be filed with the Department within 180 days after the date that a civil rights violation was allegedly committed. 775 ILCS 5/7A-102(A) (West 2010). The Department will serve a copy of the charge to the respondent, and the respondent will be required to file a verified response to the allegations. 775 ILCS 5/7A-102(B) (West 2010). When the Department accepts a discrimination complaint, a Department official investigates the allegations of the discrimination charge cited in the complaint. After analyzing the claim, the investigator prepares a written report recommending whether or not there is "substantial evidence" that an act of discrimination occurred. 775 ILCS 5/7A-102(A) to (C) (West 2010). Substantial evidence is defined as evidence that a reasonable person would accept as sufficient to support the complainant's allegations and that "consists of more than a mere scintilla but may be somewhat less than a preponderance." 775 ILCS 5/7A-102(D)(2) (West 2010). If, from the report, the Department's Director determines that there is a lack of substantial evidence, the claims must be dismissed. In cases involving charges filed on or after January 1, 2008, as in Young's case, the complainant may file a request for review with the Illinois Human Rights Commission or file a complaint in the state circuit court. 775 ILCS 5/7A-102(D)(2), (D)(3), 8-103(A) (West 2010). Here, Young first requested review with the Commission.

¶ 9 In the case at bar, after the City timely filed its verified response denying any discrimination against Young, the Department initiated an investigation of Young's claims. The Department's investigator issued a report containing statements made by: (1) Young; (2) Deputy Commissioner Vanessa Quail (Quail), another of Young's supervisors; (3) City Refuse Collection Coordinator Frank Canchola (Canchola); (4) McKennie; and (5) various individuals involved in the incident that was the basis of the written reprimand and the subsequent two-day suspension. The Department's report, dated November 10, 2008, does not indicate when, to whom, or in what manner each individual's statements were obtained.

¶ 10 The Department's investigator reported that Young claimed that she was denied the opportunity to work overtime because of her sexual orientation. Young stated that she applied for overtime whenever it was offered from June to September 2008, and her requests were denied. However, she could not provide the specific dates of these requests and denials. Young also stated that Canchola told her "the word was put out" by McKennie that she was not to receive overtime hours. She stated that other, nonhomosexual employees were given overtime hours, but she was unable to specifically name any of these employees.

¶ 11 Additionally, Young stated that Canchola issued her a two-day suspension for delaying the timeliness of a van, which was to transport other employees to their work sites.

¶ 12 The investigator's report stated that Adorn Douglas (Douglas), the van driver, reported that Young departed the van to smoke a cigarette while passengers were loading and continued to smoke after the last passenger had entered, despite the fact that Douglas had

informed Young that she was on a time schedule. The report stated that Douglas notified McKennie of the incident later that evening. The report also indicated that McKennie received a letter from an unnamed passenger, who was on the van the day of the incident, which stated that Young did enter the work van first but exited the van after it was loaded to smoke a cigarette, and that Young failed to exit the vehicle at her work location, thereby causing other passengers to be late.

¶ 13    By contrast, Young claimed that she did not delay the timeliness of the van and alleged that McKennie had Canchola issue the suspension because McKennie did not "like the way she carried herself." Young claimed that other, nonhomosexual employees had not been issued suspensions for interfering with others on the job site; however, she stated that she was not aware of any other employee who had interfered with others on the jobsite. Young also stated that she once heard McKennie say, in reference to her: "There he is. Write him up."

¶ 14    Young stated that she was unlawfully arrested on an unrelated matter and could not work for a three-week period from October 6 to October 24, 2008. Young claimed she, her mother, or her sister contacted the City every day to inform her foreman, Canchola, that she would be unable to attend work. However, on October 24, 2008, the City discharged her without giving a reason. Young claimed that the City did not discharge other, nonhomosexual employees who had attendance issues.

¶ 15    Additionally, Young presented a memorandum, discussing the incident in which Young supposedly delayed the timeliness of the work van. The memo stated that Young was the first person on the van that day and was signed by three of Young's coworkers: Vera Smith (Smith), Alicia Hicks (Hicks), and Shirley A. Watson.

¶ 16    On July 16, 2009, the Department's investigator interviewed Smith and reported that Smith stated that she was not sure if Young exited the vehicle after entering. It also reported that Smith witnessed a conversation between Young and Douglas, during which Douglas informed Young that Young had caused Douglas to be late.

¶ 17    On that same day, July 16, 2009, the Department's investigator also interviewed Hicks and reported that Hicks stated that she was also unsure if Young exited the vehicle after entering. Additionally, Hicks claimed that she was the first person to enter the van, followed by Young.

¶ 18    The Department's report indicated that, in response to Young's allegations, Quail,[1] the City's deputy commissioner, stated that the City does not track the sexual orientations of employees for privacy reasons and was therefore unaware of Young's sexual orientation. She also stated that, in accordance with the collective bargaining agreement, the City's laborers are issued overtime hours based on their seniority. The City's time record showed that Young averaged about the same number of overtime days as other laborers assigned to her shift during the period from June to September 2008. From June to July 2008, City laborers worked an average of 3.125 days of overtime work hours, and Young worked 3.00 days of

---

[1]The record does not indicate Quail's specific duties with the City or her particular relationship to Young.

overtime work hours. From August to September 2008, the average was 2.25 days of overtime work hours, and Young worked 2.00 days of overtime work hours.

¶ 19    Quail also stated that the City had disciplined other employees for interfering with performance while on the job and that Young was discharged from her employment for violating the City's "Tardiness/Absenteeism Policy," which requires department heads to initiate a discharge action against an employee who was absent without leave for five consecutive work days. Quail stated that Young, her mother, or her sister had called on October 8, 9, and 11, 2008, to inform the City that Young would be absent from work, but there were no further calls after this date. Quail stated that the City had discharged other employees who had violated the "Tardiness/Absenteeism Policy."

¶ 20    On June 13, 2009, the Department's investigator interviewed McKennie and reported that McKennie denied that he instructed the foremen not to give Young overtime hours and that he also denied having knowledge of Young's sexual orientation. The Department's investigator reported that McKennie stated that he had previously issued Young a number of disciplinary measures for her work performance, including numerous verbal counselings, two suspensions for not being in her assigned work area and not answering her radio when called, and a written reprimand for inattention to duty and inefficiency in performing her duties. McKennie also stated that Young was known for doing what she wanted, when and how she wanted.

¶ 21    The Department's investigator reported that Canchola denied telling Young that McKennie "put the word out" that she was not to be given overtime hours and also denied having knowledge of Young's sexual orientation.

¶ 22    The Department's investigator summarized the parties' evidence in a report, which recommended that Young's charge be dismissed for lack of substantial evidence. The investigator concluded that the evidence showed that: (1) Young had received overtime at the same rate as other similarly situated laborers; (2) there was a factual basis for the two-day suspension and the City had previously suspended other employees for interfering with the job performance of others; and (3) Young was discharged for violating the City's attendance policy, not for her sexual orientation. The Director of the Department dismissed Young's charge for lack of evidence.

¶ 23    On October 22, 2009, Young timely filed a request for review with the Commission, which, in reviewing the Department's decisions, may consider the Department's report, any argument and supplemental evidence timely submitted, and the results of any additional investigation conducted by the Department. 775 ILCS 5/8-103 (West 2010). Young, in her request for review, provided additional details, including the names of laborers whom she believed had received more overtime than she did and the names of those whom she believed had missed longer periods of work without being discharged. She alleged, for the first time, that she had reported McKennie, her supervisor, multiple times for sexual harassment to various City authorities and that McKennie had retaliated for this action with more harassment. The Department responded to Young's request by recommending that the dismissal be vacated and that the charge be remanded for further investigation. The Department stated, however, that since Young did not include the allegations of sexual

harassment and retaliation in her original charge of discrimination, these issues were outside the scope of her request for review. The Executive Director of the Commission vacated the dismissal and remanded the charge to the Department.

¶ 24 On remand, the Department's investigator found that the City issued 14 days of overtime between June and September 2008 and that Young had worked 5 of those days. Four out of the five laborers with lesser seniority received more overtime hours than Young did; however, Young received an amount of overtime that was more than or equal to the amount received by the 19 laborers with more seniority. The investigation also revealed that the City had previously suspended employees for interfering with the work performance of others. One instance involved a two-day suspension of a laborer who failed to work his assigned route and another involved a one-day suspension of a laborer who failed to receive a work assignment. Finally, the investigator reviewed a group of attendance records for laborers from January 2006 to October 2008 and did not find any absences that violated the City's attendance policy. He also did not find any evidence that Young was discharged because of her sexual orientation. The investigator renewed his recommendation for dismissal of the charge for lack of sufficient evidence. The Department subsequently dismissed Young's charge for the second time.

¶ 25 On April 19, 2010, Young timely filed another request for review by the Commission. She objected to the City's evidence, stating that it failed to provide "accurate" overtime records, acted in bad faith in relying on an unsigned letter as the basis for her suspension, made (unspecified) false statements about the van incident, and improperly withheld explanations of the absences of specific coworkers. Young also alleged that she had only received overtime hours when McKennie was not present and that the City had failed to dispute her claims of harassment and retaliation.

¶ 26 The Commission responded that the Department's investigation and Young's evidence did not reveal substantial evidence that the City denied Young overtime hours, issued Young the reprimand, or discharged Young because of her sexual orientation. The Commission again found that Young's allegation that she was subjected to sexual harassment and retaliation was outside the scope of the discrimination charge and her request for review.

¶ 27 On February 9, 2011, the Commission concluded that the Department properly dismissed Young's discrimination charge for lack of evidence. First, there was no evidence that Young was treated less favorably than nonhomosexual laborers regarding the receipt of overtime hours because the evidence showed that she received hours that were on par with those of similarly situated laborers. Second, the Commission concluded that there was no evidence that the City was motivated by Young's sexual orientation in issuing the reprimand and the two-day suspension. Finally, regarding Young's claim that she was discharged due to her sexual orientation, the Commission found that there was no evidence that other, nonhomosexual laborers had been treated more favorably, and there was also no evidence that the laborers specified by Young had violated the City's attendance policy. On February 9, 2011, the Commission sustained the dismissal of Young's charge.

¶ 28 On August 8, 2011, Young timely filed a petition with this court for direct review of the Commission's decision.

¶ 29                                    ANALYSIS

¶ 30        On appeal, Young seeks review of the Commission's July 5, 2011 order, which dismissed her discrimination charge. Young claims that the City discriminatorily: (1) denied her overtime work hours; (2) issued her a "written reprimand" and two-day suspension; and (3) discharged her due to her sexual orientation within the meaning of the Act (775 ILCS 5/2-102(A) (West 2010)). The Act provides that it is a civil rights violation for any employer to "refuse to hire, to segregate, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination or citizenship status." 775 ILCS 5/2-102(A) (West 2010). "Unlawful discrimination" includes discrimination against a person due to his or her sexual orientation. 775 ILCS 5/1-103(Q) (West 2010).

¶ 31        A review of the legislative history persuades us that the appropriate standard of review in this case is abuse of discretion, for the reasons we explain below.

¶ 32        Prior to 1996, the Commission held the authority to review the Department's decision to dismiss a discrimination charge for lack of substantial evidence. On January 1, 1996, the Illinois General Assembly transferred jurisdiction to the Chief Legal Counsel. Compare 775 ILCS 5/7A-102(D)(3) (West 2010), with 775 ILCS 5/7A-102(D)(2)(a) (West 1994). The standard of review before January 1, 1996, was abuse of discretion. *Traficano v. Department of Human Rights*, 297 Ill. App. 3d 435, 439 (1998); *Stone v. Department of Human Rights*, 299 Ill. App. 3d 306, 314 (1998). That standard did not change between 1996 and 2008 when jurisdiction was transferred from the Commission to the Chief Legal Counsel. *Anderson v. Modern Metal Products*, 305 Ill. App. 3d 91, 95 (1999); *Folbert v. Department of Human Rights*, 303 Ill. App. 3d 13, 25 (1999) (stating that the appropriate standard of review was abuse of discretion). The Act was amended again, effective 2008, to return to the Commission the authority to review the Department's decision to dismiss a discrimination charge for lack of substantial evidence. Pub. Act 95-243, § 5 (eff. Jan. 1, 2008). Therefore, although there is no published case which states the standard of review for decisions issued under the 2008 amendment, we have no reason to believe that the standard changed and thus we conclude that the standard of review continues to be abuse of discretion.

¶ 33        Under the abuse of discretion standard, the court should not disturb the Commission's decision unless it is arbitrary or capricious. *Owens v. Department of Human Rights*, 403 Ill. App. 3d 899, 917 (2010). A decision is arbitrary or capricious if it contravenes legislative intent, fails to consider a critical aspect of the matter, or offer an explanation so implausible that it cannot be regarded as the result of an exercise of the agency's expertise. *La Salle National Bank v. City Suites, Inc.*, 325 Ill. App. 3d 780, 786 (2001). Under this standard, the court may not reweigh the evidence or substitute its judgment for that of the Commission. *Owens*, 403 Ill. App. 3d at 917. Abuse of discretion will be found where no reasonable man could agree with the position of the lower court. *Matthews v. Avalon Petroleum Co.*, 375 Ill. App. 3d 1, 9 (2007).

¶ 34        When an employee alleges a violation of the Act based on unlawful discrimination by an

-7-

employer, Illinois courts generally apply a three-prong test. *Owens*, 403 Ill. App. 3d at 918; *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 178-79 (1989). The burden is on the employee to establish a *prima facie* case of unlawful discrimination by a preponderance of the evidence. *Owens*, 403 Ill. App. 3d at 918-19. To establish a *prima facie* case of employment discrimination, the employee must first show that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate business expectations; (3) she suffered an adverse employment action; and (4) the employer treated others similarly situated outside the class more favorably. *Id.* at 919.

¶ 35    To show the third element, that she suffered an adverse employment action, an employee must establish that the employment action was "materially adverse" and not a "mere inconvenience or an alteration of job responsibilities." (Internal quotation marks omitted.) *Id.* (quoting *Hoffelt v. Department of Human Rights*, 367 Ill. App. 3d 628, 633 (2006)). A materially adverse employment action is "one that significantly alters the terms and conditions of the employee's job" or causes a material change in the employment relationship. (Internal quotation marks omitted.) *Owens*, 403 Ill. App. 3d at 919; see also *Roney v. Illinois Department of Transportation*, 376 F. Supp. 2d 857, 866-67 (N.D. Ill. 2005). To be actionable, there must be a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007).

¶ 36    If the employee establishes a *prima facie* case of discrimination, a presumption of unlawful discrimination by the employer against the employee is established. However, the employer may rebut the presumption by articulating a legitimate, nondiscriminatory reason for its decision. If the employer articulates such a reason, the burden shifts back to the employee to prove that the employer's reason was only a pretext for unlawful discrimination. *Owens*, 403 Ill. App. 3d at 919; *Zaderaka*, 131 Ill. 2d at 178-79. However, a final determination of unlawful discrimination must be established by and supported with a factual finding. *Illinois J. Livingston Co. v. Human Rights Comm'n*, 302 Ill. App. 3d 141, 153 (1998). Throughout the proceedings, the ultimate burden of persuasion is on the employee. *Owens*, 403 Ill. App. 3d at 919.

¶ 37    Young's first claim is that she was denied overtime hours. The Commission found that Young failed to establish a *prima facie* case of discrimination for her overtime claim because she did not present evidence that she was treated less favorably than other, nonhomosexual employees or that she was subjected to an adverse employment action. For the reasons discussed below, we cannot say that the Commission abused its discretion.

¶ 38    First, Young offered no evidence that she was denied overtime in preference to similarly situated, nonhomosexual employees. The Department's investigation produced the City's time records, which showed that, while four of the five laborers with less seniority than Young received more overtime than Young did, Young received an amount of overtime that was more than or equal to the amounts received by 19 laborers with more seniority. The record also showed that Young averaged about the same number of overtime days as other laborers assigned to her shift. These facts do not demonstrate an abuse of discretion in finding that the City treated similarly situated, nonhomosexual employees more favorable

than Young regarding access to overtime.

¶ 39 Young claims that: (1) McKennie told the foremen that she was not to be given overtime hours; and (2) that she only received overtime when McKennie was not present. The City explicitly denied the first allegation. However, even if these claims were true, Young has not shown that she suffered "an adverse employment action" that altered the terms and conditions of her employment. *Owens*, 403 Ill. App. 3d at 919. There is no evidence that Young would have received additional overtime hours had the alleged discriminatory conduct not occurred, and thus Young has not demonstrated any financial loss suffered due to the alleged denial of overtime. See *Roney v. Illinois Department of Transportation*, 376 F. Supp. 2d 857, 866-67 (N.D. Ill. 2005); see also *Lewis v. City of Chicago*, 496 F.3d 645, 653-54 (7th Cir. 2007).

¶ 40 Therefore, we cannot say that the Commission abused its discretion in dismissing Young's claim that she was denied overtime due to her sexual orientation.

¶ 41 Young's second claim is that she received a reprimand and a two-day suspension as a result of discrimination. The Commission found that there is no substantial evidence that the reprimand and suspension were because of her sexual orientation. For the reasons discussed below, we cannot say that the Commission abused its discretion.

¶ 42 The Department's investigation revealed that the City had a legitimate reason for the disciplinary action, namely, that Young interfered with the job performance of others when she kept the van stopped in order to smoke a cigarette. In addition, Young did not provide evidence that the incident leading to the suspension was merely a pretext for discrimination. Young did present a memorandum, signed by three of her coworkers, stating that she was the first person on the bus that day and therefore could not have caused her coworkers to be late to their work sites. However, two of her coworkers stated that they were not sure if Young left the van after entering it, which is in accord with the van driver's account that Young departed the van to smoke a cigarette while passengers were loading and continued to smoke even after all the passengers had loaded. The van driver reported this incident to McKennie, who also received a letter from an anonymous coworker, stating that Young did enter the work van first but exited the van after it was loaded and that she also failed to exit the vehicle at her work location, causing other passengers to be late. Quail stated that the City had disciplined other employees for interfering with performance while on the job, and the Department's investigation revealed two instances where the City suspended employees for similar reasons, one instance involving a two-day suspension of a laborer who failed to work his assigned route and another involving a one-day suspension of a laborer who failed to receive a work assignment. Therefore, we cannot say that the Commission abused its discretion when it found that Young was not treated differently in these circumstances than other, nonhomosexual employees.

¶ 43 Young attempted to show that McKennie was motivated by a discriminatory animus in taking the disciplinary action. However, there is no evidence that McKennie was even aware of Young's sexual orientation. Quail stated that the City did not track employee's sexual orientation because it would be a violation of employee privacy; therefore, access to City records would not have indicated this information. McKennie also expressly denied having

-9-

knowledge of Young's sexual orientation. Even if McKennie did know that Young was a homosexual, there is no evidence that he had a discriminatory animus against her because of it. Young claims that McKennie targeted her for discipline because he did not like "the way she carried herself." However, the Department's investigation produced evidence that Young's discipline and attitude at work had led McKennie to take disciplinary actions against her.

¶ 44    In an attempt to prove McKennie's discriminatory animus, Young stated that she once heard McKennie say, in reference to her, "There he is. Write him up." However, even if this comment alluded to McKennie's knowledge of Young's sexual orientation, we have previously held that vague, ambiguous, or "stray" remarks do not give rise to an inference of discrimination. *Sola v. Human Rights Comm'n*, 316 Ill. App. 3d 528, 542 (2000). Ambiguous comments are statements that are not discriminatory in themselves but may support an inference of discrimination; stray remarks include statements made by decision makers which are unrelated to the decision process. *Id.* To be actionable, there must be a causal connection between the discriminatory remark and the adverse employment action, or the comment must be made contemporaneously with the adverse action. *Id.*; see also *Traylor v. Brown*, 295 F.3d 783, 788 n.3 (7th Cir. 2002). McKennie's remark was sufficiently ambiguous, since allegedly referring to Young with masculine instead of feminine pronouns is not itself discriminatory. Additionally, the remark was made in the context of another written reprimand but not in connection to any of Young's three discrimination claims in this case. McKennie's comment does not provide substantial evidence of a discriminatory motive in his decision to reprimand and discipline Young.

¶ 45    Therefore, there is no substantial evidence for Young's claim that the two-day suspension was an act of discrimination against her due to sexual orientation.

¶ 46    Young's third claim is that she was discharged because of her sexual orientation. The Commission found that there is no substantial evidence to support Young's claim that she was discharged because of her sexual orientation. For the following reasons, we cannot find that the Commission abused its discretion in reaching this conclusion.

¶ 47    To support this claim, Young must provide evidence that her sexual orientation was the true motivating factor in the City's decision to discharge her. *Sola*, 316 Ill. App. 3d at 538; see also *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1350 (7th Cir. 1995). However, there is no evidence that similarly situated, nonhomosexual employees received more favorable treatment than Young did in comparable circumstances. The City's "Tardiness/Absenteeism Policy" *requires* department heads to initiate a discharge action against any employee who was absent without leave for five consecutive work days, and Young was absent without leave for 12 or more consecutive work days. Young's clear violation of the policy, in addition to multiple incidents regarding her attitude and behavior at work, provided the City with legitimate, nondiscriminatory reasons for the discharge.

¶ 48    Moreover, Quail stated that the City had discharged other employees who violated the "Tardiness/Absenteeism Policy," and the Department's investigation did not produce any evidence of similarly situated City employees who had violated the policy and were not discharged. Thus, there is no evidence that nonhomosexual employees were treated more

favorably regarding violations of the attendance policy. Under the Act, the unfairness or unreasonableness of an employer's conduct is irrelevant, so long as it was not motivated by an employee's protected characteristic. See *In re Toledo*, 312 Ill. App. 3d 131, 140 (2000) (stating that the Act does not forbid favoritism, only favoritism because of an employee's protected characteristic). In this case, there is no evidence that Young's violation of the attendance policy was merely a pretext for discrimination.

¶ 49      Therefore, we cannot say that the Commission abused its discretion when it concluded that there was no substantial evidence for Young's claim that she was discharged due to her sexual orientation.

¶ 50      As a separate issue, the City has asked us to disregard the portions of Young's brief that were not presented to the Commission for review. In the review of the administrative decision, the court may only consider questions of law and fact presented in the record. 35 ILCS 5/3-110 (West 2010). No new additional evidence in support or opposition of the administration's decision may be properly heard. 735 ILCS 5/3-110 (West 2010). Therefore, pages 2 and 11 to 13 of Young's brief cannot be considered, as they are not a part of the original or supplemental records. Pages 6 and 14 to 19 are included in the record but improperly so, since they were never reviewed by the Commission. The Commission considers only "the Department's report, any argument and supplemental evidence timely submitted, and the results of any additional investigation conducted by the Department in response to the request." 775 ILCS 5/8-103(B) (West 2010). These documents were not included in the Department's report to the Commission or submitted with Young's request for review. Therefore, these documents also cannot be considered. Only pages 3 to 5 and 7 to 9 of Young's brief are properly before this Court.

¶ 51      For the foregoing reasons, we cannot say that the Commission abused its discretion when it concluded that there was no substantial evidence to support a charge of discrimination.

¶ 52      Affirmed.